

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-7-1994

# Alston v. Redman, Wdn.

Precedential or Non-Precedential:

Docket 93-7423

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Alston v. Redman, Wdn." (1994). *1994 Decisions.* Paper 125.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/125

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 93-7423


HAROLD S. ALSTON,

Appellant

v.

WALTER REDMAN, Warden; CHARLES M. OBERLY, III, Attorney General
of the State of Delaware; and the STATE OF DELAWARE,

Appellees


On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 91-00441)


Argued May 2, 1994

BEFORE: GREENBERG and GARTH, Circuit Judges,
and ROBRENO, District Judge[*]

(Filed:  September 7, 1994)


Robert E. Nicholson (argued)
155 Livingston Avenue
New Brunswick, NJ  08901

Attorney for appellant

Loren C. Meyers (argued)
Deputy Attorney General
Department of Justice
State Office Building
820 N. French Street
Wilmington, DE  19801

[*]  Honorable Eduardo C. Robreno, United States District Judge for
the Eastern District of Pennsylvania, sitting by designation.

<u>Attorney for appellees</u>

OPINION OF THE COURT


EDUARDO C. ROBRENO, District Judge.

Harold S. Alston appeals the denial by the district court of his petition for writ of habeas corpus.  He argues that his present incarceration by the state of Delaware is illegal because his conviction was bottomed on self-incriminating statements taken in violation of his constitutional rights.  More specifically, Alston claims that he was interrogated by the authorities in violation of his right to counsel as established by the Sixth Amendment and by Miranda v. Arizona, 384 U.S. 436 (1966).  He also claims that his waiver of his Miranda right to counsel was coerced.  We find that the Sixth Amendment violation was harmless error, that petitioner's invocation of his Miranda right to counsel was anticipatory since it was made outside of the context of custodial interrogation, and was thus ineffective, and that his waiver was not coerced.  We will therefore affirm.

I.

In the summer of 1985, police officers were investigating a number of robberies that had taken place in and around Wilmington, Delaware. At the scene of the robbery of Allen Medkeff and Michelle Sands (the "Medkeff-Sands robberies"), police recovered a fingerprint from an item touched by the robber. Acting upon information provided by a confidential informant linking petitioner Harold S. Alston to the Medkeff-Sands robberies, the police compared the recovered fingerprint to Alston's known prints, and established that the prints matched. A warrant for Alston's arrest issued, charging him with first degree robbery and second degree conspiracy, and he was arrested in North Carolina on August 19th. Waiving extradition, he was brought to Delaware on August 23rd, and was interrogated that same day by Delaware State Police. The police gave Alston his Miranda warnings, as required by Miranda v. Arizona, 384 U.S. at 444-45. He waived his Miranda rights and the police proceeded to question him about the robberies, including the Medkeff-Sands robberies. Though at first denying any involvement, Alston eventually admitted to a number of robberies after the police reminded him of the fingerprint that they had recovered at the scene. In light of the offer by the police interrogators that they would recommend to the prosecutor that Alston be charged with only one count of robbery if he cooperated, Alston admitted to participating in the Medkeff-Sands robberies, as well as six other robberies committed during the summer of 1985. Alston was taken before a Justice of the Peace on the robbery and conspiracy

charges and was committed to Gander Hill prison for pretrial detention.

Three days later, on August 26, 1985, Alston was interviewed by a person from the Public Defender's office, who Alston assumed was an attorney.[1] See App. at 227. During the course of the interview, Alston signed a form letter, addressed to the warden of the Gander Hill facility:

> Dear Sir:
>
> I am presently a detainee in this institution and I will not speak to any police officer, law enforcement officers, their agents, or representatives from the Department of Justice, of any jurisdiction, without a Public Defender being present at such a meeting.
>
> I further do not wish to be removed from my [cell] and brought to a meeting with the above-mentioned officers for the purpose of discussing a waiver of my constitutional rights in this regard.
>
> Signed    /s/Harold S. Alston
> Date      8-26-85

App. at 4. The letter was never actually delivered to Gander Hill's warden, since the established practice at Gander Hill was that someone from the warden's office would call the Public Defender's office when officers sought to question a prisoner, and inquire whether such a form letter had been executed. If a prisoner wished to speak to the authorities notwithstanding his prior execution of the invocation of counsel form letter, he

_____

[1]. The testimony by an investigator from the Public Defender's office at the suppression hearing held in the state trial court suggested that the individual who met with Alston was an investigator, and not an attorney. See App. at 71-72. The outcome of this appeal, however, does not turn on the identity or the status of the individual with whom Alston spoke.

would be asked to sign a form waiving his previous request to have counsel present during an interrogation.  Alston never signed this second form.

On August 28th, Alston was indicted for the Medkeff-Sands robberies.  On August 29th, he was taken from Gander Hill to the Wilmington police department for processing on the new charges stemming from the six other robberies to which he had confessed on the 23rd and for further questioning.  The warden's office made no inquiry of the Public Defender's office regarding whether Alston had signed the invocation of counsel form.  At the police station, after the police read Alston his Miranda rights and he waived them, Alston was questioned for a second time, six days after his first interrogation on August 23rd.  During this second interrogation, Alston confirmed his prior confessions, and, after prompting by one interrogator, confessed to another robbery that he had not mentioned before.  It is the legality of the use of this second confession at his trial that forms the core of petitioner's appeal.

Due to Alston's perceived lack of candor, the police informed the prosecutor of the promise made, but declined to recommend that Alston be charged with one count of robbery.  The grand jury subsequently delivered a superseding indictment against Alston and a number of other defendants, indicting Alston on nine counts of first degree robbery and nine counts of second degree conspiracy.

Before trial, Alston sought to suppress the statements he gave to the police on the 23rd and the 29th, claiming that

both of his statements were involuntary and, further, that his second statement was taken in violation of his Sixth Amendment right to counsel.  The trial court denied the suppression motion. See App. at 117-21.  Alston proceeded to trial, where the state introduced, inter alia, the fingerprint evidence, the confessions, and the testimony of Medkeff and Sands, both of whom identified Alston.  Alston was found guilty on seven of the nine robbery counts and on all of the conspiracy counts, including the Medkeff-Sands robberies.

On direct appeal, the Delaware Supreme Court agreed with Alston that the statement made during the August 29th interrogation concerning the Medkeff-Sands robberies was taken in violation of his Sixth Amendment right to counsel, but ruled that the error was harmless, since there was substantial evidence supporting the conviction.  See Alston v. State, 554 A.2d 304, 308-09 (Del.), cert. denied, 490 U.S. 1101 (1989).  The Court also found that the statements were made voluntarily, that Alston's waivers of his Miranda rights were proper, and that Alston's execution of the form provided to him by the Public Defender's office and never transmitted to the warden did not serve to invoke his Miranda right to counsel.  See id. at 307-08, 310-11.  Finally, the Court reversed one of the conspiracy convictions relating to the Medkeff-Sands robberies, since the evidence showed only one agreement.  See id. at 312.  Alston's petition for writ of certiorari was denied by the United States Supreme Court, 490 U.S. 1101 (1989), as was his application for

state post-conviction relief, <u>Alston v. State</u>, 590 A.2d 502 (Del. 1991) (unpublished disposition).

Alston petitioned the district court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, claiming, <u>inter alia</u>, that his execution of the invocation of counsel form letter was sufficient to trigger his <u>Miranda</u> right to counsel, thus rendering inadmissible at trial any statements made during the August 29th interrogation.  The petition was referred to a magistrate judge, who recommended that the petition be denied. The district court, after a <u>de</u> <u>novo</u> review of the record, adopted the magistrate judge's Report and Recommendation and denied the petition for habeas relief.  A motions panel of this Court issued a certificate of probable cause.  <u>See</u> Fed. R. App. P. 22(b).

II.

The matter was properly before the district court, and this Court has jurisdiction over petitioner's appeal.  See 28 U.S.C. §§ 1291, 2253.  The claims raised in the petition were properly exhausted, having been fairly presented to the Delaware Supreme Court.  See Castille v. Peoples, 489 U.S. 346, 351 (1989); Wise v. Fulcomer, 958 F.2d 30, 33 (3d Cir. 1992).  In deciding this appeal, the Court exercises a mixed standard of review.  The district court's legal conclusions are subject to plenary review, but factual conclusions are reviewed for clear error.  See Caswell v. Ryan, 953 F.2d 853, 857 (3d Cir.), cert. denied, ___ U.S. ___, 112 S. Ct. 2283 (1992).  There is a presumption that historical fact-finding by a state court, whether trial or appellate, is correct.[2]  See 28 U.S.C. § 2254(d); Miller v. Fenton, 474 U.S. 104, 117 (1985); Sumner v. Mata, 449 U.S. 539, 545-47 (1981).

---

[2].  As this Court stated recently, there are "four prerequisites for giving deference to state court findings:  1) a hearing on the merits of a factual issue, 2) made by a state court of competent jurisdiction, 3) in a proceeding to which the petitioner and the state were parties, 4) evidenced by a written finding, opinion or other reliable and adequate written indicia." Reese v. Fulcomer, 946 F.2d 247, 254 (3d Cir. 1991) (citing 28 U.S.C. § 2254(d)), cert. denied, ___ U.S. ___, 112 S. Ct. 1679 (1992).  There is no indication in the briefs or the record that the review by the Delaware Superior Court and Supreme Court did not satisfy the Reese requirements, and petitioner has not questioned on appeal the correctness of the state courts' findings of fact.

III.

Petitioner argues that his execution of the form provided to him by the Public Defender's office was sufficient to invoke his right to counsel and to thwart any further police-initiated questioning, thereby rendering inadmissible the statements he gave at the August 29th interrogation. Our analysis of this claim must begin with a review of Miranda and its progeny.

A.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court examined an individual's Fifth and Fourteenth Amendment right to be free from compelled self-incrimination in the context of custodial interrogation, and concluded that certain procedural safeguards were necessary to "dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgement of [a] suspect's Fifth Amendment rights." Moran v. Burbine, 475 U.S. 412, 425 (1986); see Miranda, 384 U.S. at 468; see also Malloy v. Hogan, 378 U.S. 1, 6 (1964) (incorporating the Fifth Amendment privilege against compelled self-incrimination into the Fourteenth Amendment). These safeguards include certain rights that an accused must be informed of, and must waive, before interrogation can commence:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity

> to exercise these rights must be afforded to him throughout the interrogation.

*Miranda*, 384 U.S. at 479. Only if there is a voluntary, knowing, and intelligent waiver of the rights expressed in the warnings can police question a suspect without counsel being present and introduce at trial any statements made during the interrogation. See id.; *Fare v. Michael C.*, 442 U.S. 707, 724-25 (1979); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court added a second layer of prophylaxis to the protections dictated by *Miranda*. In *Edwards*, the defendant stated during the course of interrogation that he wanted to negotiate a "deal," and was provided with a phone and the number of the county attorney. After calling the county attorney, defendant stated that he wanted a lawyer before making any deal. See id. at 479. All interrogation ceased and he was taken back to his cell. The following day, interrogation was resumed without an attorney being present and notwithstanding the defendant's assertion that he did not wish to speak. During this second interrogation, the defendant made incriminating statements, which were eventually used against him and contributed to his conviction. See id. at 480. In reversing the conviction, the Supreme Court held that once a suspect invokes his right to counsel, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Id. at 484. The Court further held that once a suspect invokes the right, there

can be no further police-initiated interrogation "until counsel has been made available to him, unless the [suspect] himself initiates further communication." Id. at 484-85; see also Minnick v. Mississippi, 498 U.S. 146, 153 (1990) (holding that after counsel is requested, there can be no further police-initiated interrogation without counsel being present). Thus, once a suspect has asked for the assistance of counsel, "it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' [of custodial interrogation] and not the purely voluntary choice of the suspect." Arizona v. Roberson, 486 U.S. 675, 681 (1988); cf. Michigan v. Mosley, 423 U.S. 96, 104-06 (1975) (finding no Miranda violation when the police resumed questioning after the suspect's invocation of his right to cut off questioning was "scrupulously honored"). The Edwards protection is not offense-specific. Rather, a suspect who has requested the presence of counsel cannot be questioned concerning any crime, not just the one that put him in custody. See Roberson, 486 U.S. at 683-84. Further, the Edwards presumption focuses on the suspect's state of mind, not the police's. "[C]ustodial interrogation must be conducted pursuant to established procedures, and those procedures in turn must enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel." Id. at 687. Thus, officers who interrogate a suspect after the suspect has invoked his right to counsel are charged with the knowledge of the prior invocation.

See, e.g., United States v. Scalf, 708 F.2d 1540, 1544 (10th Cir. 1983) (holding that knowledge of request for counsel "is imputed to all law enforcement officers who subsequently deal with the suspect").

The remedy for a violation of Miranda or Edwards is straightforward--any statement given in violation of the rules established in these cases cannot be introduced into evidence in the state's case-in-chief. See Miranda, 384 U.S. at 479; cf. New York v. Quarles, 467 U.S. 649, 655-56 (1984) (recognizing a "public safety" exception to Miranda); Harris v. New York, 401 U.S. 222, 225-26 (1971) (allowing the use of statements taken in violation of Miranda for purposes of impeachment).

The notion that custodial interrogations, in and of themselves, have an inherent coercive effect on an accused is the essential predicate to the prescription contained in the Miranda-Edwards line of cases, that counsel be present, if one is requested, when an interrogation occurs in a custodial setting. "In essence, Miranda counsel is a buffer against the power of a state tempted to force incriminating statements from an unwilling suspect."  James J. Tomkovicz, Standards for Invocation and Waiver of Counsel in Confession Contexts, 71 Iowa L. Rev. 975, 989 (1986); see also Miranda, 384 U.S. at 460 (recognizing that "the constitutional foundation underlying the privilege [against compelled self-incrimination] is the respect a government--state or federal--must accord to the dignity and integrity of its citizens").  As one commentator has noted, "[t]he [Supreme] Court presumes that the confluence of interrogation and custody

generate an intolerable degree of pressure upon a criminal suspect.  Thus, the combined impact of interrogation and custody make[s] counsel's compulsion-dispelling presence--or, at least, the opportunity to claim that presence--essential."  Tomkovicz, supra, at 991 (footnotes omitted).  Providing an accused the option of having a lawyer present during a custodial interrogation was the Miranda Court's practical accommodation of the need to shelter an accused's constitutional right to be free from compelled self-incrimination, with the public's legitimate interest in the interrogation of suspected criminals.[3]  See Moran, 475 U.S. at 426 ("Admissions of guilt are more than merely 'desirable'; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law.") (citation omitted); Miranda, 384 U.S. at 479-81.  It is Miranda's role in protecting the Fifth Amendment privilege in the singular context of custodial interrogation that is its "only

---

[3].  In contrast, the Miranda Court could have completely forbidden custodial interrogation, or could have required that all such interrogation be conducted with a judge present.  Cf. Davis v. United States, ___ U.S. ___, ___, 114 S. Ct. 2350, 2358 (1994) (Scalia, J., concurring) (suggesting that 18 U.S.C. § 3501 abrogates the Miranda safeguards in federal criminal prosecutions and requires only a determination of voluntariness); State v. Scales, ___ N.W.2d ___, ___, 1994 WL 315702, at *5 (Minn. June 30, 1994) (requiring that "all custodial interrogation . . . shall be electronically recorded where feasible" and holding that statements taken in violation of the requirement shall be suppressed if the violation is "substantial").  A complete prohibition, however, might have cut too broadly, since it is only compelled self-incrimination, not self-incrimination per se, that is forbidden by the Fifth Amendment.  See Miranda, 384 U.S. at 478; Tomkovicz, supra, at 989 n.55.

source of legitimacy." Moran, 475 U.S. at 425.[4] Because the presence of both a custodial setting and official interrogation is required to trigger the Miranda right-to-counsel prophylactic, absent one or the other, Miranda is not implicated.[5] See Miranda, 384 U.S. at 477-78; United States v. Mesa, 638 F.2d 582, 584-85 (3d Cir. 1980); see also Illinois v. Perkins, 496 U.S. 292, 297 (1990) ("It is the premise of Miranda that the danger of coercion results from the interaction of custody and official interrogation.").

---

[4]. As the Supreme Court has repeatedly noted, the Miranda safeguards are not constitutionally mandated and serve only to protect the privilege against compelled self-incrimination in the context of custodial interrogation. See, e.g., Connecticut v. Barrett, 479 U.S. 523, 528 (1987); Moran, 475 U.S. at 424-25; New York v. Quarles, 467 U.S. 649, 654 (1984); Michigan v. Tucker, 417 U.S. 433, 444 (1974); see also Giuffre v. Bissell, No. 93-5541, slip op. at 26 (3d Cir. August 4, 1994) (recognizing that the Miranda right to counsel is "a procedural safeguard, and not a substantive right").

[5]. Hence, the focus in much of the Court's Miranda jurisprudence on the legal contours of "custody," see, e.g., Stansbury v. California, ___ U.S. ___, ___, 114 S. Ct. 1526, 1528-29 (1994) (per curiam); Berkemer v. McCarty, 468 U.S. 420, 441-42 (1984); Orozco v. Texas, 394 U.S. 324, 325-26 (1969), and "interrogation," see, e.g., Arizona v. Mauro, 481 U.S. 520, 526 (1987); Estelle v. Smith, 451 U.S. 454, 468-69 (1981); Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980), and the requirement that both be present for the Miranda protections to attach.

B.

In the instant case, the magistrate judge found, and the district court agreed, that petitioner's execution of the invocation form was insufficient to trigger his Miranda right to counsel. The magistrate found that the attempt to invoke the right to counsel was made outside of the context of custodial interrogation, and was thus ineffective. Petitioner argues that this case satisfies both prongs of Miranda, pointing out that he was already in custody, he was a suspect in a number of robberies, and he had already been interrogated at the time that he made his request for counsel. All of these circumstances taken together, concludes petitioner, created the "atmosphere of coercion," Br. at 18, that Miranda and progeny seek to protect against, and mandates a finding that his invocation of his right to counsel was proper. We disagree.

As evidenced by the Supreme Court's repeated rehearsal of the issue, the term "custodial interrogation" defies easy definition. We have recognized that such a determination requires individualized analysis on a case-by-case basis. See United States v. Mesa, 638 F.2d 582, 584 (3d Cir. 1980). Assuming, arguendo, that petitioner was in custody for purposes of Miranda analysis,[6] we disagree that at the time petitioner

---

[6]. When he signed the request for counsel form on August 26th, Alston was obviously in custody in the physical sense, given that he was being held in a prison. However, "[w]hile Miranda may apply to one who is in custody for an offense unrelated to the interrogation, incarceration does not ipso facto render an interrogation custodial." Leviston v. Black, 843 F.2d 302, 304 (8th Cir.) (citations omitted), cert. denied, 488 U.S. 865 (1988); see, e.g., Cervantes v. Walker, 589 F.2d 424, 428-29 (9th

requested counsel he was being interrogated, or that interrogation was imminent. Petitioner was questioned on August 23rd and again on August 29th. There is no evidence in the record to suggest that he had been questioned on the 26th, the date on which he made his request for counsel, or that there was a continuous interrogation during the period from August 23rd to August 29th. His putative invocation of his right to counsel on August 26th was made while he was sitting in his jail cell speaking with a representative of the Public Defender's office, far removed from the strictures of custodial interrogation feared by the Miranda Court. See id. at 590 n.1 (Adams, J., concurring) ("In Innis the Court indicated that "interrogation," as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."). Absent the "interaction of custody and official interrogation," Perkins, 496 U.S. at 297, the petitioner's Miranda right to counsel had simply not attached when petitioner signed the invocation form in his cell.

(..continued)
Cir. 1978) (finding that inmate questioned during a search of his cell was not in custody because there was no greater restraint on his freedom than usual). Though Alston was in custody as a suspect in the Medkeff-Sands robberies, he was not necessarily "in custody" for Miranda purposes as to interrogation on the other robberies. Since we decide Alston's appeal on other grounds, we need not reach the issue of whether he was in custody for Miranda purposes when he requested counsel.

c.

In essence, Alston asks this Court to adopt, as an extension of the reach of Miranda, a rule allowing a suspect to invoke the right to counsel in cases where the suspect is in custody, has already been interrogated, and may be reinterrogated at some point in the future. We decline the invitation. As did the district judge, we find the Supreme Court's opinion in McNeil v. Wisconsin, 501 U.S. 171 (1991), to have presaged the result in this case. In McNeil, the petitioner was arrested on a charge of armed robbery. After a bail hearing on the armed robbery charge, at which he was represented by an attorney, he was repeatedly questioned by police officers concerning a different crime, and he eventually made an inculpatory statement. See 501 U.S. at 173-74. After his conviction at trial, at which his statement was used against him, petitioner filed for a writ of habeas corpus, arguing that his appearance at the bail hearing, accompanied by an attorney, was sufficient to invoke his Miranda right to counsel, thus invalidating the police-initiated interrogation under the operation of Edwards. See id. at 174-75. After carefully distinguishing the differing objectives of the right to counsel under Miranda and the Sixth Amendment, the Court rejected the argument that the assertion of the Sixth Amendment right to counsel was an explicit or implicit assertion of the Miranda right to counsel, holding that "[t]he rule of [Edwards] . . . requires, at a minimum, some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." Id. at 178. The Court explicitly rejected the "bright-

line" rule proposed by McNeil--"no police-initiated questioning of any person in custody who has requested counsel to assist him in defense or interrogation"--which was similar to the one advocated by the instant petitioner.  See id. at 181.

Of particular interest to the case sub judice is the majority's reply to the dissent's prediction that the decision would be circumvented by the explicit invocation of the Miranda right to counsel at preliminary hearings.  See id. at 184 (Stevens, J., dissenting).  The majority noted that premature invocation of the Miranda right to counsel would be impermissible:

> We have in fact never held that a person can invoke his Miranda rights anticipatorily, in a context other than "custodial interrogation"--which a preliminary hearing will not always, or even usually, involve.  If the Miranda right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect.  Most rights must be asserted when the government seeks to take the action they protect against.  The fact that we have allowed the Miranda right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.

Id. at 182 n.3 (citations omitted) (emphasis added).  Though this passage in McNeil is essentially dicta, being a response to a hypothetical posed by the dissent, we must consider it with deference, given the High Court's paramount position in our "three-tier system of federal courts," Casey v. Planned Parenthood, 14 F.3d 848, 857 (3d Cir. 1994), and its limited

docket.  See Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 495 n.41 (3d Cir.) (in banc), cert. denied, ___ U.S. ___, 113 S. Ct. 196 (1992); accord Doughty v. Underwriters at Lloyd's, London, 6 F.3d 856, 861 & n.3 (1st Cir. 1993); Hendricks County Rural Elec. Membership Corp. v. N.L.R.B., 627 F.2d 766, 768 n.1 (7th Cir. 1980) ("A dictum in a Supreme Court opinion may be brushed aside by the Supreme Court as dictum when the exact question is later presented, but it cannot be treated lightly by inferior federal courts until disavowed by the Supreme Court.") (citing 1B Moore's Federal Practice ¶ 0.402, at 112 & n.3), rev'd on other grounds, 454 U.S. 170 (1981).  The footnote strongly supports the proposition that, to be effective, a request for Miranda counsel must be made within "the context of custodial interrogation" and no sooner.  See United States v. Wright, 962 F.2d 953, 955 (9th Cir. 1992); United States v. Barnett, 814 F. Supp. 1449, 1454 (D. Alaska 1992).

The antipathy expressed in McNeil towards the anticipatory invocation of the Miranda rights is consistent with Miranda's underlying principles.  The Miranda right to counsel is a prophylactic rule that does not operate independent from the danger it seeks to protect against--"the compelling atmosphere inherent in the process of in-custody interrogation"--and the effect that danger can have on a suspect's privilege to avoid compelled self-incrimination.  Miranda, 384 U.S. at 478.  To allow an individual to interpose Miranda in a situation outside the custodial interrogation context would represent an unwarranted extension of Miranda's procedural safeguards, an

extension best left to the discretion of the Supreme Court, which devised the Miranda safeguards in the first place and which has quite recently expressed disinterest in expanding them. See, e.g., Davis v. United States, ___ U.S. ___, ___, 114 S. Ct. 2350, 2355 (1994) (declining "to extend Edwards and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney"); McNeil, 501 U.S. at 182; Quarles, 467 U.S. at 658 ("At least in part in order to preserve its clarity, we have over the years refused to sanction attempts to expand our Miranda holding."); see also Barnett, 814 F. Supp. at 1454 (assuming that footnote 3 in McNeil "accurately predicts that the . . . Supreme Court will hold that an accused cannot invoke his Fifth Amendment right to counsel until he is taken into custody, and prior to interrogation, warned of those rights"). As the Supreme Court recognized in Innis, "[i]t is clear . . . that the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." 446 U.S. at 300.[7]

---

[7]. Petitioner points to language in Miranda itself that, read in isolation, would seem to allow invocation of the right to counsel in the manner he proposes:

> If, however, [the defendant] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.

384 U.S. at 444–45. Read in context, however, it is clear that the "process" referred to by the Court is the actual process of custodial interrogation.

The McNeil footnote also reflects the general proposition, consistent with recent Supreme Court jurisprudence,[8] that the rights guaranteed by the Constitution of the United States are primarily negative in character, standing guard as vigilant sentinels at the perimeter of permissible state conduct. See Jackson v. City of Joliet, 715 F.2d 1200, 1203-04 (7th Cir. 1983), cert. denied, 465 U.S. 1049 (1984); David P. Currie, Positive and Negative Constitutional Rights, 53 U. Chi. L. Rev. 864 (1986). But see Susan Bandes, The Negative Constitution: A Critique, 88 Mich. L. Rev. 2271, 2273-78 & n.20 (1990) (critiquing the prevailing view of the Constitution as "a charter of negative liberties" and collecting scholarly sources espousing a similar view). It is only at the time that the state seeks to invade this citadel of individual liberty that these constitutional guarantees can be summoned to battle. This position has strong textual support in the Bill of Rights. The right of free speech, the right to be free from unreasonable searches and seizures, the right to be free from double jeopardy, the right to due process under the Fifth Amendment, all of these are framed as prohibitions on state conduct, rather than as

---

[8]. In the context of the Due Process Clause, the negative nature of constitutional rights is viewed as imposing on the state no positive obligation to act absent some special circumstance such as custody. See Collins v. City of Harker Heights, ___ U.S. ___, ___, 112 S. Ct. 1061, 1069 (1992); DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 195-200 (1989); Harris v. McRae, 448 U.S. 297, 317-18 (1980); D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1368-69 (3d Cir. 1992) (in banc), cert. denied, ___ U.S. ___, 113 S. Ct. 1045 (1993).

commandments for state action.  Similarly framed is the prohibition against compelled self-incrimination that is involved in this case.  U.S. Const. amend. V ("nor shall [any person] be compelled in any criminal case to be a witness against himself").[9]  To require that the Government first act to compel an individual to incriminate herself before that individual can assert her right to remain silent is merely to recognize that the privilege against compelled self-incrimination acts as a shield against state action rather than as a sword, and that the shield may only be interposed when state action actually threatens.[10]

[9].  In fact, the entire Fifth Amendment is written in similar vein:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger;  nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb;  nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law;  nor shall private property be taken for public use, without just compensation.

U.S. Const. amend. V.

[10].  That Miranda imposes an affirmative obligation on interrogators to inform a suspect of his rights, indeed, to provide the suspect a lawyer if one cannot otherwise be afforded, does not change the basic negative nature of the Miranda protections, because the true protection of Miranda, the suppression of statements given without a valid waiver by the suspect of her Miranda rights, only arises if the state chooses to question a suspect without providing the Miranda warnings and attempts to introduce those statements in evidence.  See Miranda, 384 U.S. at 479.  Until the attempt is made, the Miranda right, and the corresponding Fifth Amendment right it prophylactically protects, essentially lies dormant.  If the state never interrogates a suspect, Miranda is not implicated.

Our decision also finds support in the Ninth Circuit's opinion in <u>United States v. Wright</u>, 962 F.2d 953 (9th Cir. 1992). <u>Wright</u> presented a real-life example of the hypothetical posited by Justice Stevens in his <u>McNeil</u> dissent, the anticipatory invocation of the <u>Miranda</u> right to counsel.  Wright was arrested and pled guilty to armed robbery.  At the plea hearing, his attorney stated that she wanted to be present at any interviews with her client.  <u>See</u> <u>id.</u> at 954.  Shortly thereafter, Wright was interrogated, without counsel being present, as to an unrelated bank robbery.  He confessed, a confession that he moved to suppress.  When that was unsuccessful, he entered a conditional guilty plea and appealed on the basis that his counsel's statement at the hearing triggered the <u>Edwards</u> presumption concerning further police-initiated questioning.  <u>See</u> <u>id.</u>

The Ninth Circuit rejected the claim, holding that a request by counsel, during a plea hearing, to be present at any further "interviews" with a suspect did not trigger <u>Edwards</u>.  <u>See</u> <u>id.</u> at 956.  As explained by the court, <u>McNeil</u> compelled this conclusion:

> <u>McNeil</u> strongly suggests that <u>Miranda</u> rights may not be invoked in advance outside the custodial context. Wright's request through his attorney would do just that if it were more broadly effective than to assure counsel's presence at interviews having to do with the robbery.  The Court has never held that <u>Miranda</u> rights may be invoked anticipatorily outside the context of custodial interrogation; we see no reason, apart from those already rejected in <u>McNeil</u>, to do so here.

<u>Id.</u> at 955.  Though arguably distinguishable, since Wright was at a plea hearing, not "in custody," when he made his request for

the presence of counsel at future interviews, the opinion is an affirmation of the principle expressed in footnote three of McNeil that there must be both custody and interrogation before the right to counsel can be invoked.

We recognize that some courts, post-McNeil, have found a proper invocation of the Miranda right to counsel when a suspect has requested counsel prior to interrogation or to the reading of the Miranda rights. In United States v. Kelsey, 951 F.2d 1196 (10th Cir. 1991), petitioner Joseph Kelsey arrived at his home late one night to find eighteen members of a police narcotics task force conducting a search for contraband. See id. at 1198. He was searched and arrested before entering the house, and was placed on a couch alongside three others who had been arrested during the raid. Kelsey asked to see his lawyer three or four times, but the police only responded that "if they 'allow[ed] him to see [his] lawyer now, then they would not be able to ask [him] any further questions and would have to take [him] to jail.' . . . The police also told [Kelsey] that 'if [he] was to cooperate and talk with the officers, then they'd take it easy on [him] . . . .'" Id. (alteration in original). Kelsey was not questioned at this point, nor was he read his Miranda rights. He was later questioned in his home and made incriminating statements during the interrogation. See id.

The Tenth Circuit held that the request by Kelsey for his lawyer was sufficient to invoke the protections of Edwards, even thought the request was made before questioning or the reading of Miranda rights. See id. at 1198-99. Mindful of the

requirement that there be "some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police," McNeil, 501 U.S. at 178 (emphasis omitted), the Court held that Kelsey's request for counsel after being arrested, when it was "clear from the exchange between Kelsey and the police . . . that the police intended to question Kelsey at some point at his home, and that the police understood Kelsey to be invoking his right to counsel during questioning," Kelsey, 951 F.2d at 1199, was sufficient to trigger Edwards. The Court rejected the Government's argument that Rhode Island v. Innis required that there be questioning before the invocation of the right to counsel, finding that the fact that Kelsey asked for an attorney "before the police were required to inform him of that right [was] irrelevant." Id. at 1199.

In State v. Torres, 412 S.E.2d 20 (N.C. 1992), the North Carolina Supreme Court examined a similar issue. Georgia Torres was a battered spouse who one night, in the midst of an altercation with her intoxicated husband, shot him to death. Though not placed under arrest, she was transported by a police officer to the sheriff's department, and was detained in a conference room by a deputy from 7 P.M. to 10 P.M., pending questioning concerning the shooting of her husband. At around 10 P.M., she was taken into the sheriff's office, and the sheriff informed her that she would be shortly questioned by two other police officers. See id. at 24. At two points, while sequestered in the conference room and while meeting with the

sheriff, Torres asked if she needed an attorney, and was told both times that she did not. See id. at 23. At 10:35, she was given her Miranda warnings, which she waived, was interrogated, and gave an incriminating statement. See id. at 25. She was thereafter convicted of murder.

On appeal, Torres argued that her interrogation violated Edwards, since she had made a request for counsel before the police initiated her interrogation. The Court accepted her argument, finding that Edwards had been violated even though she was not being questioned at the time she requested an attorney:

> . . . [T]he State argues that defendant could not have invoked her right to counsel because she was not being questioned at the time she inquired about an attorney.
> . . . If defendant "at any stage of the process" indicates her desire to consult with counsel, all questioning must cease. . . . [A]lthough an individual cannot waive her right to counsel prior to receiving Miranda warnings, a suspect in custody can certainly assert her right to have counsel present during her impending interrogation prior to Miranda warnings and the actual onset of questioning.

Id. at 25 (citations omitted). The Court distinguished footnote three in the McNeil opinion by noting that "[t]he examples of 'anticipatory invocation' cited by the Court in that . . . footnote . . . make clear that the Court had in mind situations in which a person was not in custody at the time of her invocation." Id. Thus, for the Torres court, it was sufficient for Miranda and Edwards purposes that the suspect was in custody and awaiting interrogation when she invoked her right to counsel. See id. at 26 ("It would make little sense to require a defendant already in custody to wait until the onset of questioning or the

recitation of her Miranda rights before being permitted to invoke her right to counsel.").

The decisions in Kelsey and Torres are distinguishable from our decision in this case. The suspects in both of those cases, though not being interrogated when they requested counsel, were faced with "impending interrogation." Torres, 412 S.E.2d at 26 (emphasis added); Kelsey, 951 F.2d at 1199. Kelsey had just been arrested in his home, and the dialogue between him and his captors indicated he would be interrogated in his home. See id. Torres had been taken to the police stationhouse immediately after shooting and killing her husband, and she was sitting in a conference room awaiting imminent questioning. See 412 S.E.2d at 25-26. In no manner can Alston's situation be analogized to Kelsey and Torres. In fact, when Alston requested counsel, he was in his cell, with no state official present, speaking to a representative of the Public Defender's office, having already been interrogated three days earlier, with no further interrogation pending, and without any indication that he was to be reinterrogated. Whatever the merits of the position taken in those cases, i.e., an accused may invoke the right to counsel anticipatorily when an interrogation is imminent, the instant case falls outside the ambit of their reasoning. Given that Alston was not being interrogated when he signed the invocation form, and that no interrogation was impending or imminent, we hold that Alston was not within the "context of custodial interrogation" when he signed the invocation form, and therefore

that the prophylactic rules of Miranda and Edwards did not render
inadmissible the statement taken on August 29th.[11]

D.

Even if we were to conclude that Alston could invoke
his Miranda right to counsel when an interrogation was impending
or imminent, we cannot conclude that the method used by Alston,
i.e., advising the warden of his decision, was sufficient to
trigger the protections of Miranda-Edwards and of Arizona v.
Roberson, 486 U.S. 675 (1988).  In Roberson, the Supreme Court
rejected the contention that an interrogator's lack of knowledge
concerning a previous invocation of the Miranda right to counsel
vitiated the Edwards prophylactic:

> In addition to the fact that Edwards focuses on the
> state of mind of the suspect and not of the police,
> custodial interrogation must be conducted pursuant to
> established procedures, and those procedures in turn
> must enable an officer who proposes to initiate an
> interrogation to determine whether the suspect has
> previously requested counsel.  . . . [W]hether the same
> or different law enforcement authorities are involved
> in the second investigation, the same need to determine
> whether the suspect has requested counsel exists.  The
> police department's failure to honor that request
> cannot be justified by the lack of diligence of a
> particular officer.

---

[11].  Additionally, we note that the extension of Miranda and
Edwards implicitly requested by petitioner, i.e., allowing him to
invoke the right to counsel outside of the context of custodial
interrogation, would diminish the "bright-line" nature of the
Supreme Court's Miranda jurisprudence, often cited by the Court
as one of qualities of that body of law.  See Jackson, 475 U.S.
at 634; Smith v. Illinois, 469 U.S. 91, 98 (1984); Quarles, 467
U.S. at 658; Fare, 442 U.S. at 718.

Roberson, 486 U.S. at 687–88 (footnote omitted). Applying this language on direct appeal, the Delaware Supreme Court held that the investigating officers who interrogated Alston on August 29th could not be charged with "constructive knowledge" of an invocation contained in "records which are merely accessible to other state agents who function at the custodial level." Alston, 554 A.2d at 310. The court therefore concluded that the interrogation of August 19th did not run afoul of Roberson. We agree, though on different grounds. While the holding of the Delaware Supreme Court is based on a determination that the warden of Gander Hill prison never had possession, and thus never had knowledge, of Alston's pro forma invocation, see id., our decision turns on the inapplicability of Roberson to a non-investigating state official such as a warden.[12]

---

[12]. Because the Delaware Supreme Court rested its decision on this point, i.e., that the warden never had knowledge because he had no possession, we feel compelled to address it. We believe that basing the decision in this case on these grounds goes too far. If the state puts into place a record-keeping system that, as an essential element, contemplates that records will be maintained by a third-party, e.g., the Public Defender's office, it would be inequitable to allow the state official charged with administering the system to disclaim at least constructive knowledge of the information contained in those records. We therefore do not find the warden's lack of actual possession of Alston's letter to be dispositive.

We also note in passing that petitioner neither here nor below argued that the state should be estopped from questioning the validity of his pro forma invocation, due to the warden's establishment of and participation in the procedure employed in Gander Hill. While we do not reach the issue, we do not mean to diminish any due process considerations that may accompany official conduct that actively misleads an accused in the exercise of her Miranda rights. Cf. Tukes v. Dugger, 911 F.2d 508, 516 n.11 (11th Cir. 1990) (rejecting, in dicta, the contention that the state can disregard a suspect's invocation of the right to counsel that is made after he has been given his

The Supreme Court's opinion in Roberson focused on multiple interrogations concerning different crimes, principally holding that the Miranda right to counsel was not offense-specific.  See 486 U.S. at 682-85.  As a corollary to that holding, the Court directed that "custodial interrogation must be conducted pursuant to established procedures, and those procedures in turn must enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel."  Id. at 687 (emphasis added).  Later interrogators are thus charged with the knowledge of what occurred during prior interrogations, not what occurred during other time periods, i.e., while the suspect was sitting in his cell speaking with a representative from the Public Defender's office.  The practical implication of this conclusion is that noninvestigatory officials charged with the mere custody or care of a suspect, e.g., jailers, doctors, vocational instructors, should not be considered state agents capable of accepting a suspect's invocation of his Miranda rights.[13]  Any other interpretation of Roberson would not provide serviceable guidance to law enforcement officials seeking to administer the Miranda-Edwards protections, since, in effect, they would become absolutely liable for any statement made by an incarcerated

(..continued)
Miranda warnings, even if the suspect is not yet in custody), cert. denied sub nom. Singletary v. Tukes, ___ U.S. ___, 112 S. Ct. 273 (1991).

[13]. With the caveat that someone acting as an investigatory official's agent in conducting an interrogation would likely assume the status of her principal.

suspect to his jailer.[14]  This conclusion is consistent with our rejection supra of anticipatory invocations.  If Alston cannot assert his Miranda rights anticipatorily, it would make little sense to permit him to assert them to the warden, a noninvestigatory state official.

Petitioner cites to no case law, other than Roberson itself, supporting his contention that the knowledge of his putative invocation on the 26th must be imputed to the officers who interrogated him on the 29th, and the Court's research has likewise failed to unearth any such support.  On the contrary, the courts that have applied Roberson were dealing with defendants who were reinterrogated notwithstanding earlier requests for counsel that were made to law enforcement officers. See, e.g., United States v. Lucas, 963 F.2d 243, 244-45 (9th Cir. 1992); United States v. Lenfesty, 923 F.2d 1293, 1297 (8th Cir. 1991);  Balfour v. State, 598 So.2d 731, 736, 745-46 (Miss. 1992); State v. Schuster, 502 N.W.2d 565, 570 (S.D. 1993); cf. People v. Young, 607 N.E.2d 123, 126-28 (Ill. 1992) (refusing to impute knowledge from a Wisconsin law enforcement agency to an Illinois law enforcement agency).  We conclude that knowledge of

---

[14].  Petitioner's focus on Roberson's admonition that Edwards "focuses on the state of mind of the suspect," 486 U.S. at 687, does not change the result.  In Edwards, there was no question that there had been a proper invocation of the right to counsel. See Edwards, 451 U.S. at 479 (suspect stated during custodial interrogation that "I want an attorney before making a deal"). Absent such a proper invocation, the suspect's state of mind is essentially irrelevant, because a suspect cannot "believe" a right into existence.  Since Alston's initial invocation was insufficient, the fact that he believed he had invoked his right to counsel is beside the point.

the letter "sent" by Alston to the warden of the Gander Hill facility cannot be imputed to the police officers who interrogated Alston on the 29th, and that the interrogation was therefore not violative of Miranda, Edwards, or Roberson.[15]

*   *   *

We decline to extend the reach of Miranda-Edwards to encompass a suspect sitting in his cell, free of any interrogation, impending or otherwise. As the Supreme Court stated in rejecting the McNeil petitioner's proposal to expand Miranda, "[i]f a suspect does not wish to communicate with the police except through an attorney, he can simply tell them that when they give him the Miranda warnings." McNeil, 501 U.S. at 180. We add no more.

_____

[15]. Alston's argument that the absence of a waiver of counsel form on file in the warden's office is notice of an invocation of the right to counsel is also without merit. The presence or absence of forms in a custodial state agent's files cannot suffice for the imputation of knowledge to investigatory officials.

IV.

Petitioner also argues that the magistrate and district judges erred in concluding that the admission of the statements taken in violation of his Sixth Amendment right to counsel was harmless error. Before the Delaware state courts, and before this Court, the respondents have acknowledged that the statements of August 29th concerning the Medkeff-Sands robberies were impermissibly taken, since Alston's Sixth Amendment right to counsel had attached once the indictment of August 28th was returned, and he was interrogated without his lawyer being present. See Michigan v. Jackson, 475 U.S. 625, 636 (1986) (applying the Edwards presumption concerning police-initiated interrogations to the Sixth Amendment right to counsel); United States v. Gouveia, 467 U.S. 180, 198 (1984); Massiah v. United States, 377 U.S. 201, 206 (1964).[16] The state courts and the district court found that this error, however, was harmless, since there was sufficient evidence introduced during trial to convict Alston regardless. We agree.

In Deputy v. Taylor, 19 F.3d 1485 (3d Cir.), cert. denied, ___ U.S. ___, 114 S. Ct. 2730 (1994), we recently held that admission of a statement taken in violation of the Sixth Amendment right to counsel is "trial type error," requiring on collateral review application of the harmless error standard

_____

[16]. Under Maine v. Moulton, 474 U.S. 159, 180 & n.16 (1985), interrogation concerning the other crimes was permissible, notwithstanding the attachment of the Sixth Amendment right to counsel as to the Medkeff-Sands robberies. This point is not contested on appeal.

utilized in Brecht v. Abrahamson, ___ U.S. ___, 113 S. Ct. 1710 (1993).  See Deputy, 19 F.3d at 1495-96; see also Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991) (opinion of Rehnquist, C.J., for the Court) (characterizing a "confession obtained in violation of Massiah" as a "trial error").  Under Brecht, "where a constitutional error is a 'trial type error' which implicates the weight and effect of evidence presented to the jury, we must ask whether the error had 'substantial and injurious effect or influence in determining the jury's verdict.'"  Deputy, 19 F.3d at 1496 (quoting Brecht, 113 S. Ct. at 1722).  The analysis "'must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened.'"  Brecht, 113 S. Ct. at 1724 (Stevens, J., concurring) (quoting Kotteakos v. United States, 328 U.S. 750, 764 (1946)).  Only if the error was not harmless can the writ of habeas corpus issue.

The evidence at trial concerning the Medkeff-Sands robberies was substantial.  Both victims identified Alston as the perpetrator, Alston's fingerprint was recovered at the scene, and Alston confessed to the crime during the interrogation of August 23rd.  The evidence introduced concerning the August 29th confession, consisting of the testimony of one of the interrogators as well as a transcript of the confession, which had been recorded, was in essence cumulative.  Viewed in relation to the other evidence in the case as to the Medkeff-Sands robberies, the Court finds that the August 29th statements did not have a "substantial and injurious effect" on the jury's

verdict, and their introduction into evidence was therefore

harmless error.[17]

---

[17]. The Delaware Supreme Court applied the higher standard announced in <u>Chapman v. California</u>, 386 U.S. 18, 23-24 (1967), finding that the error was "harmless beyond a reasonable doubt." <u>Alston</u>, 554 A.2d at 309. Were the Court required to apply this standard, we would reach the same conclusion.

V.

Petitioner's final point of appeal is that the interrogation of August 29th somehow denied him "fundamental fairness," and was therefore violative of the Fourteenth Amendment's Due Process clause.  In support of this argument, petitioner states that he "could not resist the pressures of custodial interrogation," and argues that this is the only possible conclusion "because, otherwise, it is incomprehensible why a 28 year [old] literate man with three prior felonies would so readily incriminate himself."  Pet. Br. at 32.  Petitioner apparently claims that his waiver of his Miranda rights at the beginning of the August 29th interrogation was somehow faulty, and he was therefore deprived of his right to counsel.  See Miranda, 384 U.S. at 444 (providing that the Miranda safeguards may be waived, "provided the waiver is made voluntarily, knowingly and intelligently"); Ahmad v. Redman, 782 F.2d 409, 412-13 (3d Cir.), cert. denied, 479 U.S. 831 (1986).  The respondents argue that this issue was initially raised in petitioner's objections to the magistrate's report, was therefore not properly before the district court, and ipso facto is not properly before this Court.  Whatever merit respondent's position may have, the record in this case indicates that the magistrate judge addressed petitioner's Fourteenth Amendment claim, see Report & Recommendation at 12, and we will do likewise.

"[T]he voluntariness of a defendant's waiver of Miranda rights is a mixed question of law and fact, subject to plenary review by federal habeas courts."  Ahmad, 782 F.2d at 413.

Though we do not treat with deference the legal conclusions reached by the state court, the underlying factual findings, upon which the court based its conclusions, if fairly supported by the record, are entitled to the statutory presumption of correctness provided by 28 U.S.C. 2254(d).  See McAleese v. Mazurkiewicz, 1 F.3d 159, 166 (3d Cir.), cert. denied, ___ U.S. ___, 114 S. Ct. 645 (1993); Reese v. Fulcomer, 946 F.2d 247, 254 (3d Cir. 1991), cert. denied, ___ U.S. ___, 112 S. Ct. 1679 (1992).  In assessing the validity of the waiver, we must determine whether it was voluntary, i.e., free of coercion or deception, and whether it was knowing.  "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."  Moran, 475 U.S. at 421 (quoting Fare v. Michael C., 442 U.S. at 725); see United States v. Velasquez, 885 F.2d 1076, 1084 (3d Cir. 1989), cert. denied, 494 U.S. 1017 (1990).

The Delaware courts found that Alston understood his Miranda rights when he signed the waiver form proffered to him at the beginning of the August 29th interrogation.  See App. at 118, 254.  This finding has a basis in the record, given defendant's execution of the waiver form and the testimony of the interrogating officers concerning their recitation of the rights and Alston's acknowledgement that he understood them.  Cf. Collins v. Brierly, 492 F.2d 735, 739 (3d Cir.) (in banc) ("It may be assumed that [a written waiver's] main purpose is evidentiary, to establish with a minimum of difficulty and a

maximum of certainty that the police gave the warnings and that the suspect had agreed--preliminarily--to answer questions."), cert. denied, 419 U.S. 877 (1974).  There is also no contention that Alston did not understand his Miranda rights when he waived them during the interrogation of August 23rd.  Given the presumption of correctness, we are satisfied that Alston understood his Miranda rights, and that he did knowingly waive them at the August 29th interrogation.

As to the question of voluntariness, the only indication in the record of any coercion on the part of the interrogators is the offer to Alston to make a plea recommendation to the prosecutors if Alston cooperated fully in the interrogation.  "That a law enforcement officer promises something to a person suspected of a crime in exchange for the person's speaking about the crime does not automatically render inadmissible any statement obtained as a result of that promise." United States v. Walton, 10 F.3d 1024, 1028 (3d Cir. 1993); see Miller v. Fenton, 796 F.2d 598, 604-08 (3d Cir.), cert. denied sub nom. Miller v. Neubert, 479 U.S. 989 (1986).  The question of voluntariness ultimately turns on whether the totality of the circumstances indicates that the will of the suspect was overborne by government coercion.  See Colorado v. Connelly, 479 U.S. 157, 169-70 (1986); Moran, 475 U.S. at 421; Walton, 10 F.3d at 1028.  In making its assessment, the Court must evaluate the events that occurred, as well as the suspect's background and experience, including prior dealings with the criminal justice system.  See Oregon v. Bradshaw, 462 U.S. 1039, 1046 (1983)

(plurality opinion); <u>United States v. Cruz Jimenez</u>, 894 F.2d 1, 7-8 (1st Cir. 1990); <u>Velasquez</u>, 885 F.2d at 1086.

The Delaware Supreme Court made the following findings of fact concerning Alston's background:

> Alston was 28 years old at the time of his arrest and had previously been convicted of three felonies. Alston had completed the tenth grade and was able to read and write. At the time his statements were made he was alert and did not appear to be under the influence of alcohol or drugs. The interviews were during the day, and each interview lasted approximately one to one and one-half hours. Although in custody, Alston was not handcuffed during either session.

<u>Alston</u>, 554 A.2d at 307. We find no reason, and Alston makes no claim, to disturb these findings. <u>See</u> 28 U.S.C. § 2254(d); <u>Reese</u>, 946 F.2d at 254.

As to the promise, the investigators promised Alston during the interrogation of August 23rd that they would recommend to the prosecutor that Alston be allowed to plead to one count of first degree robbery, a promise conditioned on Alston's full cooperation. The promise was made with the caveat that the recommendation was in no way binding on the prosecutor. App. at 41-42, 54-55. During the course of the first interrogation, Alston did not mention a robbery that the police suspected him in, a robbery to which Alston confessed during the second interrogation <u>after</u> the police prompted him. Due to this failure to cooperate, as well as the police's strong belief that Alston had been involved in other crimes as to which he did not confess at either interrogation, the police informed the prosecutor of the proposal made to Alston, but did not make the recommendation.

App. at 102-03.  As already noted, Alston was then indicted on nine counts of first degree robbery and nine counts of second degree conspiracy.

In light of Alston's age, literacy, and prior experience with the criminal justice system, as well as the limited nature of the promise made by the investigators, a promise to make a non-binding recommendation to the prosecutor, the Court finds that Alston's written waiver of his Miranda rights on August 29th was not coerced.  Alston's three prior convictions indicate that he was not "an 'uninitiated novice,' susceptible to coercive pressure or threats by law enforcement officers."  Cruz Jimenez, 894 F.2d at 8.  If anything, his dealings with the criminal justice system would have allowed him to fully comprehend the serious situation in which he found himself, as well as the nature of the circumscribed promise made to him.  Faced with substantial charges, implicated in the Medkeff-Sands robberies by fingerprint evidence, and incriminated by his confession of August 23rd, a confession that he does not challenge, Alston's decision on August 29th to waive his Miranda rights and cooperate with the authorities was a reasonable one, and there is nothing in the record to indicate that the promise made coerced him into waiving his rights.

As Chief Justice Burger noted in his concurrence in Edwards, the Supreme Court "consistently has 'rejected any paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case.'"  Edwards, 451 U.S. at 490-91 (Burger, C.J., concurring) (quoting Mosley,

423 U.S. at 109 (White, J., concurring)).  We find that Alston made just such an autonomous decision when he waived his Miranda rights and spoke with the police on August 29th, and that he was not denied in any way the "fundamental fairness" guaranteed him by the Fourteenth Amendment.

## VI.

This petition has raised some significant questions concerning the efficacy of the procedures used in Delaware's Gander Hill prison facility.  Perhaps if this Court were charged with crafting a procedure for the recordation and maintenance of a suspect's invocation of his right to counsel, we would devise a less cumbersome system than the one applied to the petitioner.  But it is not our task to develop such a system, nor do we sit as an ecumenical overseer of the state's detention procedures.  We are solely charged with determining whether petitioner is being held in violation of his constitutional rights.  Limited as we are to this jurisdictional grant, we find that there was no deprivation of Alston's constitutional rights, and will affirm the district court's denial of Alston's petition.