**UNITED STATES of America**

v.

**James Arthur GRIMES.**

**No. 95–49–Cr–J–20.**

United States District Court,
M.D. Florida,
Jacksonville Division.

Jan. 2, 1996.

Charles R. Wilson, United States Attorney and Stephen M. Kunz, Assistant United States Attorney, Tampa, FL, for the United States.

James H. Burke, Jr., William Mallory Kent, and Mark Rosenblum, Federal Public Defender, Jacksonville, FL, for Defendant.

## ORDER

SCHLESINGER, District Judge.

This cause is before the Court on the Motion to Suppress Statements and Evidence Obtained in Derivation Therefrom (Doc. No. 49, filed October 30, 1995) (Motion to Suppress). The United States filed its opposition to the Motion to Suppress on November 9, 1995 (Doc. No. 52). An evidentia-

ry hearing was held by United States Magistrate Judge Snyder on December 8, 1995.

On December 13, 1995, the United States Magistrate Judge submitted a Report and Recommendation (Doc. No. 81). The Magistrate Judge recommended that the Motion to Suppress be denied. Defendant James Arthur Grimes' Objections to Magistrate's Report and Recommendation was filed December 18, 1995 (Doc. No. 86).

Upon consideration of the Report and Recommendation, and the objections made thereto, and upon conducting an independent *de novo* review of the entire record in this matter, the Court overrules the objections and adopts and confirms the Magistrate Judge's findings.

Accordingly, it is **ORDERED AND ADJUDGED:**

(1) the Magistrate Judge's Report and Recommendation (Doc. No. 81) is **ADOPTED,** and it is specifically incorporated into this Order; and

(2) Motion to Suppress Statements and Evidence Obtained in Derivation Therefrom (Doc. No. 49, filed October 30, 1995) is **DENIED.**

DONE AND ENTERED.

## REPORT AND RECOMMENDATION[1]

SNYDER, United States Magistrate Judge.

### Status

This cause is before the Court on Defendant Grimes' Motion to Suppress Statements and Evidence Obtained in Derivation Therefrom (Doc. # 49; hereinafter Motion to Suppress), filed on October 30, 1995. The Response of United States in Opposition to Defendant Grimes' Motion to Suppress Statements and Evidence Obtained in Derivation Therefrom (Doc. # 52; hereinafter Response) was filed on November 9, 1995.

---

1. Typically, written objections may be filed in accordance with Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this document. In this case, the Defendant has consented to a three (3) day objection period following service of this Report and Recommendation. Failure to timely serve objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

An evidentiary hearing on the Motion to Suppress was held on December 8, 1995.

### Evidence and Testimony

On July 21, 1994, James A. Grimes was arrested by an officer of the Jacksonville Sheriff's Office (hereinafter JSO) on an Information and Capias charging he had committed the crime of obtaining property via a worthless check. Defendant Exhibit 1, admitted on December 8, 1995, at [unnumbered] 1–4. On July 22, 1994, a state judge entered an order appointing a public defender to represent Mr. Grimes and, on the same day, Defendant and his counsel signed a form entitled Defendant's Claim of Rights. *Id.* at [unnumbered] 5–6. Defendant was released from custody shortly thereafter.

Before or during October of 1994 Kenneth Pender, a friend of the Defendant, spoke with a neighborhood police officer named Gary Ellis. Mr. Grimes had made incriminating statements to Pender, one of which was that the wrong individual was the victim of a bombing at the Cedar Cove apartment complex. Pender informed Ellis of Grimes' statements [2] and Officer Ellis related them to Gayward Hendry, an investigator with the Special Prosecution Unit of the State Attorney's Office. Subsequently, Officer Ellis took Pender to a meeting attended by Investigator Hendry and other law enforcement officers.

Investigator Hendry testified he first met Mr. Pender on October 11, 1994. Hendry, who had been investigating the activities of the Defendant, asked Pender to keep in contact with Grimes. Hendry maintained communication with Pender and interviewed him concerning his contacts with the Defendant.

On December 13, 1994, William Judd Stevenson, a deputy sheriff with the JSO, received information there were outstanding warrants for Defendant's arrest on charges relating to worthless checks. Stevenson was also informed Mr. Grimes would be at a particular location that day at a certain time. The deputy sheriff proceeded to the location and encountered Mr. Grimes, who was then accompanied by Mr. Pender. Grimes was arrested and advised of his rights, which he stated he understood. Grimes was advised of the nature of the charge, which he indicated he understood, and was taken to the Duval County Jail. At the jail he was served with the outstanding warrants concerning a violation of probation and various felony and misdemeanor charges. On December 14, 1994, a state court judge found Defendant insolvent and appointed the public defender to represent him. Defendant's Exhibit 1 at [unnumbered] 10. On the same date Mr. Grimes and his counsel signed a Defendant's Claim of Rights form which read, in pertinent part, as follows:

1. The Defendant, together with the undersigned counsel, the Public Defender for the Fourth Judicial Circuit of Florida, hereby asserts his/her right not to make any statements, oral or written, regarding the facts or circumstances of the offense(s) with which he/she is charged, or regarding the facts or circumstances of any criminal offenses for which he/she is not charged (but is merely a witness or suspect), unless his/her attorney is present during any questioning and/or making of any such statements. The Defendant claims his/her right to counsel and the right to remain silent pursuant to Amendments 5 and 6 of the Constitution of the United States.

2. Defendant further asserts that any future waiver of the right to have counsel present or to remain silent must be in writing (with reference to this notice), and only after notice has been given to his/her attorney of the Defendant's intention to waive this right and an opportunity provided for the Defendant and his/her attorney to discuss the waiver of these rights.

*Id.* at [unnumbered] 11.

Shortly after Defendant's December 1994 arrest, Investigator Hendry spoke with Pender again and instructed that if Mr. Grimes attempted to contact Pender by telephone, Pender should speak with him. Hendry also advised Pender not to talk to the Defendant

---

**2.** Defendant also told Pender he placed the bomb at the Cedar Cove apartments but had not constructed it. However, the record is unclear with regard to when this statement was made and whether it was included in the information Pender provided Officer Ellis.

about the pending worthless check charges and not to solicit information regarding any other crime. Pender was, however, told to listen in the event the Defendant wanted to talk. After the December 1994 arrest, Pender did not initiate any telephone calls with Grimes; rather, the Defendant would call him collect.

Investigator Hendry testified that, at some point in time, Pender was instructed to record his telephone conversations with the Defendant, and the first recording occurred on January 6 or 7, 1995. Telephone records of Pender's residence reveal approximately seventy collect calls were received from the Duval County Jail from December 13, 1994, through February 8, 1995; however, there were many calls in which Grimes and Pender did not speak because Pender was not available. Also, there were calls in which Pender spoke with Grimes but could not record due to the presence of family members, who Pender had not informed of his cooperation with authorities.

On January 22 or 23, 1995, Pender was asked to change his focus and attempt to solicit statements from Grimes. Pender was instructed by the police to tell Grimes a friend had some work for the Defendant, which Pender did. In response, Grimes indicated he could work for this person and made some statements concerning arson and bombing. According to Investigator Hendry, there were discussions with the Assistant State Attorney and the JSO jail staff regarding arranging the release of the Defendant.

On February 7, 1995, the Defendant entered into and signed a Plea of Guilty and Negotiated Sentence. Defendant Exhibit 1 at [unnumbered] 12. In exchange for his plea of guilty and agreement to make restitution, the state of Florida agreed to drop charges in certain cases against Mr. Grimes and that he be sentenced to two years probation with certain conditions. *Id.* Defendant's guilty plea was accepted by a state court judge the same day and he was adjudged guilty. *Id.* at [unnumbered] 13–14; *see also* Defendant Exhibit 2, admitted on December 8, 1995, at 12. An Order of Probation entered by the state court judge re-

veals he was sentenced to two years probation, with one of the conditions of probation being that he "enter and successfully complete the program at the Probation Restitution Center." Defendant Exhibit 1. Although not specifically reflected in the Order of Probation, during the hearing the judge pronounced that Defendant "will be released only to the custody of the Salvation Army with transportation to PRC." Defendant Exhibit 2 at 12.

On February 8, 1995, Defendant was released from the custody of the Duval County Jail and picked up by Pender, who was driving a car [3] provided to him by the JSO. The time of pick-up was arranged through the JSO jail staff. Pender had been instructed by law enforcement officers to pick up Mr. Grimes and take him to a marina in St. Augustine where Investigator Hendry would be operating undercover. When Defendant was picked up by Mr. Pender he informed he planned to abscond and was not going back. During the trip to St. Augustine Pender told Defendant several times that they could turn around and go elsewhere, such as South Carolina or a camp in the Osceola National Forest, but Grimes insisted he wanted to work for Pender's "friend."

Once at the marina in St. Augustine, Pender and Grimes went to a boat and met Hendry and other undercover law enforcement officers. From this point, it was arranged that Pender, Grimes and Hendry would go to a room Hendry had rented at the Ponce de Leon Hotel. Prior to going to the hotel, however, Pender again told Grimes he could go back to the camp and gave him several options to leave. Defendant replied he would go to the hotel.

After they had arrived at the hotel room and had ordered some pizza, Pender and another undercover officer left the room. While in the hotel room, which was wired for sound and video cameras, Defendant had two or three beers. Thereafter, Grimes and Hendry left the hotel and travelled north toward Jacksonville.

---

3. According to Investigator Hendry, the car was wired for sound and under surveillance.

After their vehicle entered into Duval County, a pre-arranged stop of the vehicle was made by JSO Patrolman Eugene R. Baker, Jr. Baker placed the undercover officer under arrest and told Grimes the basis for the other's arrest was for carrying a concealed firearm and the belief he was wanted for robbery. Baker had been instructed to ask Grimes to accompany him to the Police Memorial Building in Jacksonville and he did so. Defendant agreed to go and, upon arrival, he was taken to a second floor interview room. Hendry met briefly with Defendant and identified himself as a law enforcement official.

At this time he was placed under arrest. Quinnie F. Baxter, a JSO detective, questioned Grimes along with a Detective Roberts. According to Baxter, Grimes was brought to the Police Memorial Building at approximately 3:20 p.m. on February 8, 1995. Baxter testified that, even prior to Defendant's release from jail earlier the same day, it was arranged he would be brought back. Baxter advised Grimes of his rights from a form, which Defendant acknowledged in writing and appeared to understand. When Baxter asked if he understood his rights, the Defendant replied affirmatively. Baxter also testified Grimes was not impaired or under the influence of alcohol at the time his rights were read to him.

### *Untimeliness*

■ The United States argues Defendant's Motion to Suppress was untimely filed. Response at 4. Rule 12(b)(3) of the Federal Rules of Criminal Procedure provides generally that motions to suppress evidence must be made before trial. Rule 12(c), however, permits the court to establish "a time for the making of pretrial motions or requests and, if required, a later date of hearing." Pursuant to Rule 12(f), if a defendant fails to file a motion within the timetable set by the court, his right to assert the motion is waived. *United States v. Smith,* 918 F.2d 1501, 1509 (11th Cir.1990); *United States v. Milian–Rodriguez,* 828 F.2d 679, 683 (11th Cir.1987), *cert. denied,* 486 U.S. 1054, 108 S.Ct. 2820, 100 L.Ed.2d 921 (1988). However, relief from the waiver may be granted by the court "for cause shown." Rule 12(f), Federal Rules of Criminal Procedure.

■ In the present case, the Court initially established May 15, 1995, as the deadline for the filing of any motions prompted by a review of discovery. Scheduling Order (Doc. # 11), entered on April 24, 1995, at 1. Defendant sought an extension of this deadline, *see* Motion to Extend Motion Deadline and to Continue Motion to Suppress (Doc. # 20; hereinafter Extension Motion), filed on May 15, 1995, which the Court granted. *See* Order (Doc. # 21), entered on May 17, 1995. The deadline was extended to May 25, 1995, and it was further noted the Defendant could seek further modification of the Order if the trial was thereafter continued. *Id.* On May 24, 1995, Mr. Grimes filed a Motion to Continue Trial (Doc. # 24) which indicated a valid motion to suppress was a possibility but that more time was needed for review of discovery materials. Approximately five months later it was represented that information had recently come to Defendant's attention which reflected there could be grounds for a motion to suppress. Defendant's Motion to Continue Trial (Doc. # 47), filed on October 27, 1995. Without seeking an extension of the May 25, 1995, deadline for such motions, Mr. Grimes brought the instant Motion to Suppress.

At the suppression hearing, prior to evidentiary development, the Court heard from counsel on the timeliness issue. It was argued the Assistant Federal Public Defender initially assigned to this case, James Burke, Esquire, was unaware that "Edwards Notices" were routinely filed in state court, as he had never worked as a state public defender. It was claimed this issue did not come to light until another Assistant Federal Public Defender, William Mallory Kent, Esquire, overheard a taped conversation, which was provided by the United States during discovery, being replayed which indicated one of the conversants was imprisoned. The United States represented it provided Defendant with discovery in May 1995, and argued the tapes reflected Mr. Grimes was in jail at the time of the recording and Defendant's counsel should have noticed the issue was

present because "Edwards Notices" are not unique to the Duval County Jail.

The delinquent bringing of the Motion to Suppress and the attempted explanation of the reasons for such delay are unsettling under the circumstances. First, Defendant failed to formally seek Court approval to file the Motion to Suppress out of time. Second, the audio tape evidence which, when examined, prompted the filing of the Motion to Suppress was in the possession of Defendant's attorneys as early as May 15, 1995. *See* Extension Motion at [unnumbered] 1. The Court cannot accept as an excuse that Defendant's attorneys either "missed" the issue or were unfamiliar with it, as neither would constitute sufficient cause for which to grant relief from the Rule 12(f) waiver.

██ Defendant's counsel argued the Court should sanction Defendant's attorneys rather than prejudice the Defendant by denying the Motion to Suppress without ruling on its merits. The Court determines the merit of the Motion to Suppress should be reached and it is not necessary to sanction counsel. The trial court enjoys discretion in deciding whether a suppression motion has been timely made. *See Smith,* 918 F.2d at 1509; *Milian–Rodriguez,* 828 F.2d at 683. Although denying the Motion to Suppress as untimely would likely not constitute an abuse of discretion, three reasons justify deciding the Motion to Suppress on its merits. First, and most importantly, it has been held the "desire to avoid penalizing a criminal defendant for the inadvertence of his attorney constitutes 'cause' under [Rule] 12(f) and is within the court's discretion." *United States v. Hall,* 565 F.2d 917, 920 (5th Cir.1978).[4] Second, denying the Motion to Suppress solely on the basis of untimeliness would likely open the door for a collateral attack by the Defendant and, if so, lead to a waste of judicial resources. Third, it is plausible the District Judge, in granting the Defendant's Motion to Continue Trial implicitly permitted the Motion to Suppress to be filed out of time, given the Defendant sought continuance for the purpose of filing the Motion to

Suppress, *see* Defendant's Motion to Continue Trial at 2, and the District Judge referred the motion to suppress to the undersigned. Clerk's Minutes—Criminal Status Conference (Doc. # 48), filed on October 30, 1995. Therefore, it is recommended the Motion to Suppress not be denied as untimely but, rather, the Court make its determination based upon the merits.

### *Statements*

Mr. Grimes argues that, after his arrest in December 1994, law enforcement officers recruited Mr. Pender to serve as a government agent, and Pender initiated contact with the Defendant and tape recorded telephone conversations between the two. Motion to Suppress at 2. It is contended the police knew the Defendant was represented by counsel and had invoked his rights to counsel and to remain silent, yet no law enforcement agent disclosed their identities or actions to Defendant or his counsel. *Id.* at 3. Defendant also claims his statements "were obtained by a fraudulent and deceitful violation of his right to counsel and right to remain silent. They were not freely and voluntarily made because the agents induced the statements by false promises of benefit to Mr. Grimes." *Id.*

### *Invocation of Right to Counsel*

██ An individual's invocation of his right to counsel under either the Fifth or Sixth Amendment bars subsequent interrogation by law enforcement officers outside the presence of an attorney unless the exchange is prompted by the defendant. *Michigan v. Jackson,* 475 U.S. 625, 636, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631 (1986) (invocation of right to counsel at arraignment or similar proceeding renders any subsequent police-initiated interrogation pursuant to waiver invalid); *Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) (accused having invoked right to counsel not subject to further interrogation unless he initiates succeeding "communication, exchanges, or conversations").

---

4. "In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), [the Eleventh Circuit] adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981." *Milian–Rodriguez,* 828 F.2d at 683 n. 4.

### Sixth Amendment

The United States Supreme Court has discussed the Sixth Amendment right to counsel as follows:

> The Sixth Amendment right ... is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, " 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *United States v. Gouveia,* 467 U.S. 180, 188[, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146] (1984) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689[, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411] (1972) (plurality opinion)).

*McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). In other words, the Sixth Amendment cannot be invoked in one prosecution so as to bar subsequent interrogation in other, non-related offenses. Furthermore, "just as the right is offense specific, so also its *Michigan v. Jackson* effect of invalidating subsequent waivers in police-initiated interviews is offense specific." *Id.*

▪ Mr. Grimes contends that the Defendant's Claim of Rights form executed and filed in his state case immediately following his December 13, 1994, arrest "constitutes a clear and sufficient invocation of [his] rights" under the Fifth and Sixth Amendments. Motion to Suppress at 6. With respect to the Sixth Amendment, the above-mentioned authority makes clear this assertion is meritless. As *McNeil* discusses, the Sixth Amendment right to counsel is offense specific. Defendant's arrest in December 1994 was based solely on charges related to worthless checks. *See* Defendant Exhibit 1. Even assuming Defendant's Claim of Rights form would otherwise be a valid invocation of his Sixth Amendment right to counsel, it is valid only with respect to the worthless checks charges. Defendant's Claim of Rights form was not, however, an assertion of the Sixth Amendment right to counsel with respect to charges related to arson or bombing incidents, as Mr. Grimes had yet to be arrested, nor adversary judicial proceedings initiated,

on such charges. Because adversary judicial criminal proceedings on any arson or bombing charges were not yet initiated, Defendant's Sixth Amendment right to counsel on such charges had not yet attached.

### Fifth Amendment

Defendant alleges his Fifth Amendment right to counsel was violated by law enforcement officers. Motion to Suppress at 6. The Fifth Amendment protections afforded by *Edwards* do not dissipate upon mere consultation with counsel.

> [W]hen counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.
>
> . . . .
>
> *Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities. . . .

*Minnick v. Mississippi,* 498 U.S. 146, 153, 156, 111 S.Ct. 486, 491, 492, 112 L.Ed.2d 489 (1990). However, "[t]he *Edwards* rule ... is *not* offense specific: Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present." *McNeil,* 501 U.S. at 177, 111 S.Ct. at 2208 (citing *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988)) (emphasis in original).

### Custody

▪ Because the Fifth Amendment right to representation of counsel is not offense specific, the Court must examine carefully the facts from the point at which this right attaches, which is when Mr. Grimes was taken into custody. "The requirement that an individual receive *Miranda* warnings before answering questions applies only when the individual is in custody." *United States v. Torkington,* 874 F.2d 1441, 1445 (11th Cir. 1989) (per curiam); *accord Jacobs v. Singletary,* 952 F.2d 1282, 1291 (11th Cir.1992). "The Fifth Amendment protection against compelled self-incrimination provides the right to counsel at custodial interrogations."

*Michigan v. Jackson,* 475 U.S. at 629, 106 S.Ct. at 1407. When a court is to determine whether an individual was in custody, it must examine all the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California,* — U.S. —, —, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994) (per curiam) (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam))).

The initial determination of custody will depend upon the objective circumstances of the interrogation and not the subjective views of either the interrogating officer or the individual being questioned. *Id.* — U.S. at —, 114 S.Ct. at 1529. Thus, the relevant inquiry is "whether a reasonable person in [the defendant's] position would have felt a restraint on his freedom equivalent to that normally associated with a formal arrest." *Torkington,* 874 F.2d at 1445; *see also United States v. Adams,* 1 F.3d 1566, 1575 (11th Cir.1993).

The evidence and testimony elicited during the evidentiary hearing establish Mr. Grimes was briefly in police custody during July 1994; he had been arrested on July 21, 1994, and was released shortly thereafter. According to the testimony of Investigator Hendry, the Defendant was not in custody in October 1994 when the investigator met Mr. Pender and asked him to begin cooperating with law enforcement by keeping in contact with Mr. Grimes. On December 13, 1994, Mr. Grimes was formally arrested on outstanding charges connected to the use of worthless checks. Hence, any statements elicited from Mr. Grimes between late July and the December 13, 1994, arrest could not have resulted from custodial interrogation. Defendant remained imprisoned after the December arrest until his release on Febru-

ary 8, 1995. Therefore, he was obviously in custody during this time frame. Mr. Grimes' custodial status following the false arrest of Investigator Hendry the afternoon of February 8, 1995, after Grimes met with the undercover officers, is fairly apparent, as he was placed under arrest upon his arrival at the Police Memorial Building.[5]

The disputed time with respect to the custody issue is the period during which Mr. Grimes was released from the Duval County Jail on February 8, 1995. Defendant apparently argues he was at all times "in continuous custody and/or subject to court supervision." Motion to Suppress at 6 (footnote omitted). He contends the "release for less than twenty-four hours [on February 8, 1995], while under court supervision, was arranged by law enforcement, in what amounted to a fraud on the court." *Id.* n. 3. The United States asserts Mr. Grimes was released from custody on February 8, 1995, after having received a probationary sentence on the worthless check charge. Response at 19.

The Court determines Mr. Grimes was not in custody after his release from the Duval County Jail on February 8, 1995. As stated above, "to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized [so that] he would not feel free to leave." *Adams,* 1 F.3d at 1575. The circumstances at the time of the Defendant's release were as follows. He had just pleaded guilty to charges involving worthless checks and was sentenced to a two-year term of probation with special conditions of restitution and participation in and successful completion of a Probation Restitution Center program. Mr. Pender testified when he picked up the Defendant at the Duval County Jail on February 8, 1995, he was not handcuffed. Although the automobile Pender was using had been provided by the JSO, there is no evi-

5. Even if it can be said Mr. Grimes was in custody at the time he was asked to accompany Patrolman Baker to the police station, this would be of no import. Patrolman Baker testified he only asked the Defendant if he would accompany the officer to the police station and that no other conversation between them took place except for Mr. Grimes volunteering a comment regarding a boat in St. Augustine.

dence it contained any markings so indicating. After Grimes was in the car Mr. Pender told him several times that, if he so desired, Pender would drive him to locations other than the marina in St. Augustine. This option was also presented to Grimes before he went to the hotel with Investigator Hendry and Mr. Pender. Grimes, however, expressly declined these offers. Furthermore, Mr. Grimes told Pender he was going to abscond and did not intend to report back to probation.[6] Even given that Mr. Pender was working as an undercover police operative, the totality of the circumstances finds a reasonable person in Mr. Grimes' position could not have felt a restraint on his movement equivalent to a formal arrest, as he had been released from the jail, given a probationary sentence, was not handcuffed and provided the opportunity to avoid or terminate contact with the undercover law enforcement officers. Moreover, his expressed intent to abandon his probationary obligations indicates he was plainly aware his liberty was unrestrained at this time.

Defendant contends his release from state custody amounted to a fraud on the court. It is true the state court judge instructed, during the hearing at which Mr. Grimes pleaded guilty and was sentenced, that the Defendant "be released only to the custody of the Salvation Army with transportation to PRC." Defendant Exhibit 2 at 12. However, the Order of Probation in which a judgment of guilt was imposed and the probation term set does not indicate release to the custody of the Salvation Army was a condition of probation. Defendant Exhibit 1 at [unnumbered] 16–18. The Order of Probation states that after the Defendant was instructed concerning the conditions of probation "[he] shall be released from custody if [he is] in custody." *Id.* at [unnumbered] 18. The Court cannot find that any sort of fraud or deceit on the court occurred through the release of Mr. Grimes. The state court judge's oral pronouncement during the February 7, 1995, hearing is not consistent with the written Order of Probation entered the same day. While Investigator Hendry was not aware of the extent of any conversations with the state

court judge, he testified the Defendant's release was discussed with this judge. Defendant has not established before this Court that any illegality occurred during the February 8, 1995, release from the Duval County Jail.

The Defendant points out the period of time for which Mr. Grimes was released on February 8, 1995, was very brief. *See* Motion to Suppress at 6 n. 3. It is indeed correct that Mr. Grimes' release from the custody of the Duval County Jail lasted less than one day. However, there is no prescribed time of release for which one will automatically be considered out of custody; rather, the focus is on the objective circumstances confronting the suspect at the time. In this vein, that law enforcement officers had probable cause to arrest the Defendant for an arson offense and intended to arrest him if he attempted to abscond or refused to accompany them to the station are immaterial in the Court's analysis of whether a suspect is in custody. *See United States v. Reynolds,* 762 F.2d 489, 492–93 (6th Cir. 1985).

*Interrogation*

 Under the Fifth Amendment, an accused having invoked his right to counsel cannot be subjected to further interrogation "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1885. However, the prohibition of further interrogation is limited to subsequent *police-initiated* custodial interrogation and does not preclude mere contact. If an accused initiates further communications, law enforcement officers may quite properly participate in the exchange even in the absence of defense counsel. *See Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85.

During his incarceration following the December 13, 1994, arrest, the only possible interrogation of Mr. Grimes would have been conducted by Mr. Pender. The evidence strongly indicates Pender agreed to cooperate with law enforcement officers and was

---

**6.** Another indicator of Grimes' intent not to report to probation is his request that Pender obtain for him materials to disguise his physical appearance.

operating under their instruction by recording his conversations with the Defendant and, at one point, attempting to solicit incriminating information from him. Thus, it appears Pender was, indeed, a government agent. *See Lightbourne v. Dugger*, 829 F.2d 1012, 1020 (11th Cir.1987), *cert. denied*, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). Pender's activity in merely listening to Mr. Grimes during their telephone conversations would not have risen to the level of interrogation. It would seem, though, that Pender's actions, from January 22 or 23, 1995, in affirmatively seeking to elicit incriminating statements from Mr. Grimes, may have constituted interrogation by a law enforcement agent. For two reasons, however, the Court need not proceed further with an analysis of any interrogation conducted by Mr. Pender.

*Fifth Amendment Rights Not Invoked*

█ The first reason is that Mr. Grimes never adequately invoked any Fifth Amendment rights he may have enjoyed. When the Defendant was arrested on December 13, 1994, he was advised of his constitutional rights by the arresting officer, William Judd Stevenson.[7] When asked if he understood his rights, Mr. Grimes indicated he did. Although Deputy Sheriff Stevenson did not interview the Defendant, he testified that Mr. Grimes did not invoke his rights nor request an attorney.

Defendant emphasizes the fact that he and his attorney signed the Defendant's Claim of Rights form on December 14, 1994, and argues this was an assertion of his Fifth Amendment right to counsel. Motion to Suppress at 6. It is clear, however, the claim of rights form was not a valid invocation of Mr. Grimes' Fifth Amendment rights. In addressing whether a statement at a preliminary hearing constituted an invocation of the *Miranda* right to counsel with regard to future interrogation concerning another offense, the Supreme Court noted:

> We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than "custodial interrogation"—which a preliminary hearing will not always, or even usually, involve, cf. *Pennsylvania v. Muniz*, 496 U.S. 582, 601–602[, 110 S.Ct. 2638, 2650–2651, 110 L.Ed.2d 528] (1990) (plurality opinion); *Rhode Island v. Innis*, 446 U.S. 291, 298–303[, 100 S.Ct. 1682, 1688–1691, 64 L.Ed.2d 297] (1980). If the *Miranda* right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. Most rights must be asserted when the government seeks to take the action they protect against. The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.

*McNeil*, 501 U.S. at 182 n. 3, 111 S.Ct. at 2211 n. 3.[8]

More recently the Third Circuit, after a thorough discussion of *McNeil* and other cases, found an *Edwards* notice similar to the one executed by Mr. Grimes[9] insufficient to

---

7. Deputy Sheriff Stevenson read the Defendant's rights from a card, and the Court finds the rights as read comport with the requirements of *Miranda*.

8. Although arguably dicta, the Court may not ignore the substance of footnote 3 from *McNeil*. *See Alston v. Redman*, 34 F.3d 1237, 1246 (3rd Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995).

9. In *Alston*, the defendant was arrested, pursuant to a warrant, on charges related to certain robberies. *Alston*, 34 F.3d at 1240. He was warned of and waived his *Miranda* rights prior to interrogation and thereafter made certain admissions concerning various other robberies. *Id.* While

in pretrial detention the defendant spoke with an investigator from a public defenders office and signed a letter (addressed to the detention facility warden) which read, in pertinent part, as follows:

> I am presently a detainee in this institution and I will not speak to any police officer, law enforcement officers, their agents, or representatives from the Department of Justice, of any jurisdiction, without a Public Defender being present at such a meeting.
> I further do not wish to be removed from my [cell] and brought to a meeting with the above-mentioned officers for the purpose of discussing a waiver of my constitutional rights in this regard.

invoke the Fifth Amendment right to counsel with regard to future questioning for other crimes. *Alston v. Redman*, 34 F.3d 1237, 1245–49 (3rd Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995). The *Alston* Court discussed footnote 3 of *McNeil* as follows:

> The antipathy expressed in *McNeil* towards the anticipatory invocation of the *Miranda* rights is consistent with *Miranda*'s underlying principles. The *Miranda* right to counsel is a prophylactic rule that does not operate independent from the danger it seeks to protect against—"the compelling atmosphere inherent in the process of in-custody interrogation"—and the effect that danger can have on a suspect's privilege to avoid compelled self-incrimination. To allow an individual to interpose *Miranda* in a situation outside the custodial interrogation context would represent an unwarranted extension of *Miranda*'s procedural safeguards, an extension best left to the discretion of the Supreme Court, which devised the *Miranda* safeguards in the first place and which has quite recently expressed disinterest in expanding them. As the Supreme Court recognized in *Innis*, "[it] is clear ... that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."

*Id.* at 1246–47 (citations omitted). The Third Circuit further explained that footnote 3 of *McNeil* comports with the notion that those rights protected by the Constitution are, for the most part, negative rights, and noted:

> To require that the Government first act to compel an individual to incriminate [himself] before that individual can assert [his] right to remain silent is merely to recognize that the privilege against compelled self-incrimination acts as a shield against state action rather than as a sword, and that *the shield may only be interposed when state action actually threatens.*

*Id.* Following indictment for the initial robberies, he was returned to a police station for questioning and, after receiving and waiving *Miranda* rights, the defendant was interrogated and confessed to yet another robbery not previously men-

*Id.* at 1247 (footnote omitted) (emphasis added).

The record contains no evidence suggesting Mr. Grimes was being questioned or otherwise interrogated on December 14, 1994, the date he signed the declaration of rights form. Furthermore, no possible interrogation was initiated until January 22 or 23, 1995. Thus, "[g]iven that [Grimes] was not being interrogated when he signed the [declaration of rights] form, and that no interrogation was impending or imminent ... [he] was not within the 'context of custodial interrogation' when he signed the ... form, and therefore ... the prophylactic rules of *Miranda* and *Edwards* [do] not render inadmissible" his subsequent statements. *Id.* at 1249. Based upon footnote 3 of *McNeil* and the Third Circuit's opinion in *Alston*, the Defendant's Claim of Rights form was not a valid invocation of the Fifth Amendment right to counsel.

*Necessity of Miranda Warnings*

■ The second reason further analysis of the interrogation, if any, by Mr. Pender is unnecessary is because *Miranda* warnings were not required prior to any questioning by Pender. The fact that Mr. Pender was acting as an agent for the United States and did interrogate Mr. Grimes is to no avail. In *Illinois v. Perkins*, where a murder suspect imprisoned on an unrelated burglary charge was duped into making incriminating statements regarding the murder to an undercover agent posing as a fellow inmate, the Supreme Court held:

> Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a "police-dominated atmosphere" and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect. When a suspect considers himself in the company

tioned. *Id.* at 1241. In a 28 U.S.C. § 2254 petition it was argued "that his execution of the invocation of counsel form letter was sufficient to trigger his *Miranda* right to counsel." *Id.*

of cellmates and not officers, the coercive element is lacking. There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess.

It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation. We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent. Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will, but where a suspect does not know that he is conversing with a government agent, these pressures do not exist.

*Perkins,* 496 U.S. 292, 296–97, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990) (citations omitted); *see also Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Pender testified he told no one of his cooperation with the authorities in this matter, and there is no indication Mr. Grimes was aware of it at the time their telephone conversations took place. Thus, Mr. Grimes was not entitled to receive *Miranda* warnings prior to any discussion with Mr. Pender.[10]

Hence, the Court finds that, from his arrest on December 13, 1994, to his release on February 8, 1995, although in custody and, after January 22 or 23, 1995, arguably subject to interrogation by Mr. Pender, Mr. Grimes did not invoke his Fifth Amendment right to counsel. Also, *Miranda* warnings were not necessary prior to the initiation of any questioning by Mr. Pender. During the time of his release on February 8, 1995, the Court finds Mr. Grimes was not in custody. Even if the Defendant was in custody during this time period, pursuant to *Perkins* and *Hoffa, Miranda* warnings were not necessary before the initiation of any communications by the undercover law enforcement officers due to the lack of any elements of coercion. *See supra* n. 10.

### *Voluntary Statements*

■ Defendant argues his statements "were not freely and voluntarily made because the agents induced the statements by false promises of benefit to Mr. Grimes." Motion to Suppress at 3. In determining whether a defendant's statement is made voluntarily, the issue is whether the person's will to choose between remaining silent and making a statement is affected by any undue pressure. As the Eleventh Circuit elaborated,

> The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Colorado v. Connelly,* 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986) (citation omitted). The district court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession. Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception and discussions of realistic penalties for cooperative and non-cooperative defendants are normally insufficient to preclude free choice.

*United States v. Mendoza–Cecelia,* 963 F.2d 1467, 1475 (11th Cir.1992) (citations omitted), *cert. denied sub nom. Marin–Hernandez v. United States,* 506 U.S. 964, 113 S.Ct. 436,

---

**10.** Furthermore, even accepting Mr. Grimes' argument he remained in law enforcement custody after his release from the Duval County Jail on February 8, 1995, any statements elicited by the undercover law enforcement officials would remain admissible under a *Perkins* and *Hoffa* analysis. While meeting with the undercover agents, Mr. Grimes was unaware of their identities as police officers, just as he was unaware Mr. Pender was cooperating with officials. Therefore, the coercive elements of a "police-dominated atmosphere" did not exist, and *Miranda* warnings were not necessary. *Perkins,* 496 U.S. at 296, 110 S.Ct. at 2397.

121 L.Ed.2d 356 (1992); *accord Leon v. Wainwright*, 734 F.2d 770, 772 (11th Cir. 1984); *United States v. Castaneda–Castaneda*, 729 F.2d 1360, 1362 (11th Cir.1984), *cert. denied*, 469 U.S. 1219, 105 S.Ct. 1202, 84 L.Ed.2d 345 (1985).

██ First, the record is devoid of evidence of a law enforcement officer making any promise or assurance of benefit to Mr. Grimes. Second, there is no indication Mr. Pender engaged in any acts of wrongdoing that induced the Defendant to make any statements during their telephone conversations. With respect to the Defendant's meeting with the undercover agents in St. Augustine, Investigator Hendry testified the meeting was very friendly and that no threats, force or violence were used against Mr. Grimes. According to Hendry, the Defendant was not handcuffed. Thus, the record reflects the Defendant's statements made during his incarceration and brief release therefrom were, voluntary.

██ On February 8, 1995, after he was brought to the Police Memorial Building in Jacksonville and advised he was under arrest, Mr. Grimes was advised of his *Miranda* rights by Detective Quinnie Baxter. Baxter utilized a JSO Constitutional Rights form to advise the Defendant of his rights, which Mr. Grimes signed. *See* Defendant Exhibit 6, admitted on December 8, 1995. The Court finds these rights meet the requirements of *Miranda*. Defendant said he understood his rights but did not invoke them. In response to the detective's questioning, Mr. Grimes informed he could read and write, was not under a doctor's care and was not on any drugs or alcohol. Following the advisement of rights, the Defendant provided a statement to Baxter and another JSO detective.

At the suppression hearing it was argued this statement was not voluntarily given because the Defendant was under the influence of alcohol and that his level of impairment was apparent based upon his becoming sick during the meeting at the hotel. The Court rejects this argument. Although the Defendant claimed he was not on any drugs or alcohol, Detective Baxter was aware Defendant had consumed two or three beers in the hotel room. Investigator Hendry indicated

Mr. Grimes drank three beers during the meeting with undercover agents. However, Baxter testified the Defendant appeared to understand his rights and, from talking to him, the detective determined Grimes was not impaired. In his experience as a law enforcement officer, Baxter has seen people who were under the influence of, or impaired by, alcohol.

Furthermore, the Court rejects the Defendant's contention his vomiting during the hotel meeting was an indication of intoxication. Investigator Hendry, who was with Mr. Grimes in the hotel room, testified the Defendant ingested three containers of beer, which were provided after he had requested alcohol. Although he vomited once, Hendry stated the Defendant did not appear intoxicated and seemed to understand what he was talking about. Furthermore, Mr. Pender, who was also present at the hotel, testified Mr. Grimes admitted to not feeling well and stated he had a nervous stomach. Thus, given his complaint of a nervous stomach and the assertions of Baxter and Hendry that he did not appear intoxicated, the Court finds Defendant's bout of sickness at the hotel was not an indicator of intoxication. Based upon the foregoing, the Court finds he was not under the influence of alcohol so as to affect the voluntariness of his subsequent statements at the Police Memorial Building.

### RECOMMENDATION

Accordingly, it is recommended the Motion to Suppress (Doc. # 49) be **DENIED**.

**ENTERED** at Jacksonville, Florida, this 13th day of December, 1995.